

# HELEN F. DALTON & ASSOCIATES, P.C.
## ATTORNEYS AT LAW

80-02 Kew Gardens Road, Suite 601, Kew Gardens, NY 11415

Tel. (718) 263-9591 Fax. (718) 263-9598

August 31, 2022

**Via ECF**
The Honorable District Judge Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re: **Rubio, *et al* v. Leefam Cleaning, Inc., *et al***
Civil Docket No.: 21-cv-05515 (JMA)(SIL)

Dear Judge Azrack:

Our office represents Claudia Rubio and Maria Machado (collectively, "the Plaintiffs") and we submit this motion jointly with counsel for Leefam Cleaning, Inc. and Wilson Lee (collectively, "the Defendants"), requesting the Court's approval of the parties' Settlement Agreement. The terms of the parties' Settlement Agreement, attached hereto as **Exhibit 1**, were reached following a full-day Court-annexed mediation held on July 19, 2022.

The parties submit this motion in support of their position that the Settlement Agreement is fair and reasonable and does not raise any of the concerns cited in *Cheeks v. Freeport Pancake House, Inc*., 796 F.3d 199 (2d Cir. 2015). The parties address the monetary and non-monetary terms as well as Plaintiffs' counsel's requested attorneys' fees and respectfully request that the Court So Order or approve the Settlement Agreement.

### I. The Monetary Terms of the Settlement Agreement are Fair and Reasonable

#### a. The Settlement Amount

The parties agreed to resolve this matter for the total amount of $115,000.00 payable in six monthly installments to the Plaintiffs, inclusive of attorneys' fees, which are addressed below.

#### b. Plaintiff's Position

Plaintiffs brought this action against Defendants alleging violations of the Fair Labor Standards Act ("FLSA") and New York Labor Laws ("NYLL"). In general, Plaintiffs alleged that

they were not paid proper overtime wages when they were required to work in excess of forty (40) hours per workweek and that, for certain periods of their employment, Plaintiffs' hourly rates of pay fell below the applicable New York State minimum wage rates.

Plaintiffs were employed as cleaners at Defendants' business located at 172 Middle Neck Rd, Great Neck, New York. Both Plaintiffs alleged that they were employed by Defendants from in or around July 2016 until in or around July 2021.

Plaintiffs alleged that they were regularly required to work six (6) to seven (7) days per week and up to seventy-eight (78) hours per week. Plaintiffs further alleged that they were both compensated at $10.00 per hour for all hours worked, including those in excess of forty (40) hours per week, for the entirety of their employment. As such, Plaintiffs first alleged that their hourly rates of pay fell below the minimum wage for the years 2018 through 2021 and they further alleged that they were not compensated at a rate equal to time-and-a-half either their hourly rate of pay or the applicable minimum wage rate for their overtime hours worked. Additionally, as Plaintiffs claimed that they regularly worked in excess of 10 hours per shift, they alleged entitlement to one hour of pay per shift at the applicable minimum wage pursuant to NYLL's spread of hours provision. Lastly, Plaintiffs claimed entitlement to statutory penalties for Defendants' alleged failure to provide compliant wage notices and wage statements pursuant to NYLL § 195.

In total, Plaintiffs claimed a total of approximately $221,000.00 in unpaid wages.

Although Plaintiffs were confident that they could prevail on all of their claims at trial, Plaintiffs also considered the following factors: 1) the potential probative value of Defendants' time and pay records; 2) the factual disputes that remained as to the dates of Plaintiffs' employment (including periods where Defendants disputed that Plaintiff were employed by them), the hours worked by Plaintiffs and the amounts of pay received by Plaintiffs; 3) the risks, time and expenses associated with litigation, anticipated motion practice and preparing and conducting a trial; 4) the value of a significant settlement payable in the near future as opposed to uncertainty of recovery at a much later date; and 5) the financial abilities of the Defendants. In all, these factors weighed in favor of Plaintiffs accepting the above-referenced settlement amount.

   c. **Defendants' Position**

**Plaintiffs' Claims Are Barred by Releases They Executed After Their Employment Ended**

After leaving work on July 12, 2021, Plaintiffs failed to show up for work for three (3) straight days without any communication, leaving Defendants short-handed to operate the business. On July 15, 2021, Defendant Wilson Lee ("Lee") informed them in writing that they were deemed to have abandoned their employment and reminded them that they owed outstanding monies previously lent to them (i.e. $1,100 owed by Rubio and $900 owed by Machado).

In response, Plaintiffs both texted Lee. Rubio acknowledged that she owed Lee money (but contested the amount), and admitted abandoning her job because of a verbal altercation with a co-worker. She also texted, "Don't worry I'm not going back to work. I only I'm going one day to pay you back," and that "I am very thankful for you because you have done many good things for

me. I am thankful for you because I know you're not a bad person." Machado texted Lee that she did not owe him any money, but that it was Lee that owed her money. After follow up text messages, Lee sent Rubio payment for 2 days of work that was still outstanding. However, Rubio still owed $1,100 to Lee for a loan he had previously provided to her. She acknowledged same by texting Lee on July 18, 2021, "Thank you for sending the payment. In last week of August I'm going to send you the money I owe you."

During July 2021, Plaintiffs pleaded for reinstatement several times. Eventually, on July 26, 2021, Lee texted Machado that "[a]fter over 2 weeks of abandonment by you, it's clear that you have quit. It was very difficult because of your abandonment but I have moved on. Your job has been replaced. Do not come back." In response, on July 28, 2021, Machado threatened to call the "labor department" if Lee did not reinstate Plaintiffs. Lee responded that Plaintiffs had abandoned their jobs and "I had to find different workers to run my business." Lee also stated that he viewed Machado's threat as blackmail and extortion, which he would report to law enforcement. This was completely unrelated to Plaintiffs' immigration status, but solely based on the perceived threat to pressure Lee to re-hire Plaintiffs. Notwithstanding, during the same exchange, Lee offered a severance to Plaintiffs as a means of resolving their separation of employment. Specifically, he texted Machado, "However I will give you and your niece a severance money (check for $550) and I will forgive the money that I lent you $900 as a mutual friendly way to say goodbye. If that's agreeable to you and your niece."

On July 30, 2021, Machado texted Lee, "Wilson! Not going to work for you! Can you send me the money that you owe me!" Lee and Machado later spoke via telephone, at which time Lee offered her $3,000 as severance. On July 31, 2021, Rubio texted Lee that "I was working for you for 5 years I need you pay me for that time because the long time I working for you you pay only $10 an hour the same money you give it to Maria you got to give it to me." She also texted Lee "We signed the paper the only thing we want cash we can sign them Monday and you got to give both the same 3,000 to her 3,000 for me if you want we meet you Monday then 10 a.m."

On August 1, 2021, Lee texted Rubio that he would meet Plaintiffs at Dime Bank in Great Neck, NY on the following Monday at 10 a.m. He also texted her to "Make sure to bring photo ID with you (passport or driver's license) to sign the papers and to get notarized and to get cash for $3000 each)." On August 2, 2021, Machado texted Lee, "Wilson the money you going to give it to me take it for you and give me back my job." Rubio also texted me that day that they wanted to wait until the following Monday to sign the documents.

On August 4, 2021, Rubio texted Lee that Plaintiffs could meet that day. Lee reminded her to "make sure to bring ID Passport, or drivers license." Plaintiffs met Lee at Dime Bank on that day. Prior to entering the bank, Lee explained to Plaintiffs the purpose of signing the documents. Plaintiffs executed releases in front of Lee and Notary Public, Mary J. Lindemann who works at Dime Bank (the "Releases"). In exchange, Lee provided them with checks in the amount of $3,000 each. The memo line of the checks stated "mutual agreement for termination of employment." Lee then advised Plaintiffs that they could cash the checks at the cashier window in the bank (which they did). Plaintiffs were never promised reemployment and the Releases specified that the only consideration being provided to Plaintiffs was $3,000 each.

## I. NYLL Claims

Courts, including this Court, have routinely held that releases are enforceable with respect to NYLL claims. See Tortomas v. Pall Corp., 2020 U.S. Dist. LEXIS 97159, *6-10, 2020 WL 2933669 (E.D.N.Y. May 31, 2020)(J. Azrack)(dismissing NYLL claims where plaintiff executed separation agreement containing release of claims); Hummel v. AstraZeneca LP, 575 F. Supp. 2d 568, 570 (S.D.N.Y. 2008)("Courts have repeatedly upheld the validity of broadly-worded releases with respect to claims brought pursuant to New York employment statutes"); Difilippo v. Barclays Capital, Inc., 552 F. Supp. 2d 417, 426 (S.D.N.Y. 2008) (Plaintiff "executed a general release and waiver, waiving his right to seek relief under the New York Labor Law in exchange for a severance payment and is barred from raising this claim."); Simel v. JP Morgan Chase, 2007 U.S. Dist. LEXIS 18693, 2007 WL 809689, at *3 (S.D.N.Y. Mar. 19, 2007) ("All of the plaintiff's state law wage claims against the defendant reference the period of his employment before his departure. They are squarely within the scope of the Agreement and are considered settled thereunder.").

Notably in Tortomas, this Court concluded that whatever additional protections the FLSA might provide to employees who enter into settlements, "those protections simply do not apply to the NYLL." See Tortomas, *supra* at *10 (emphasis added) citing Simel, 2007 U.S. Dist. LEXIS 18693, 2007 WL 809689, at *4.

Here, Plaintiffs' execution of the Releases subjected their NYLL claims to dismissal.

## II. FLSA Claims

The Second Circuit has not held that extra-judicial releases of FLSA claims are unenforceable. Even after the Second Circuit's decision in Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015), courts have universally enforced releases of FLSA claims in private settlement agreements entered into prior to litigation where there is "nothing to impugn the validity of the Agreement and no allegations in the Complaint suggesting that the Agreement was the result of one-sided bargaining.". See Young Min Lee v. New Kang Suh Inc., 2019 U.S. Dist. LEXIS 26049, 2019 WL 689085, *2 (S.D.N.Y. Feb. 15, 2019); Gaughan v. Rubenstein, 261 F. Supp. 3d 390, 401 (S.D.N.Y. 2017); Matamoro v. Khomari, 2017 U.S. Dist. LEXIS 208760, 2017 WL 6542954, at *2 (S.D.N.Y. Dec. 19, 2017).

Here, the FLSA claims cannot proceed, as they were not the result of one-sided bargaining. In fact, Plaintiffs stated that they believed they were owed unpaid wages and specifically demanded $3,000 each. Although Defendants dispute the claims, they assented to Plaintiffs' request for $3,000 each and agreed to waive outstanding loans.

Accordingly, Plaintiffs' FLSA claims were also subject to dismissal.

**III.     Plaintiffs Never Raised Any Arguments To Create Void the Releases**

During this litigation, Plaintiffs argued that the Releases were unenforceable for various reasons. None of these arguments have any basis in fact or law. Thus, there was a real possibility that Plaintiffs' claims could have been barred.

First, Plaintiffs included a diatribe as to mistreatment by a co-worker. This does not further any argument to defeat a motion to enforce the Releases.

Second, Plaintiffs argued that the Releases are not enforceable because they could not read English, did not know that they were executing Releases and relied on Lee's statement that they were signing the document as "proof of money" Lee provided them. These representations were not true as outlined above and otherwise legally insufficient to overcome enforcement of the Releases. The Releases were 1 page documents that Plaintiffs could have read or requested an explanation of. Moreover, the checks that Plaintiffs received stated that the money was being provided as part of an agreement regarding their termination. Importantly, courts routinely hold that "failure to read or understand a contract does not relieve a signer of its obligations thereunder." Suqin Zhu v. Hakkasan NYC LLC, 291 F. Supp. 3d 378, 387 (S.D.N.Y. 2017) (internal citations omitted); see also Brandywine Pavers, LLC v. Bombard, 108 A.D.3d 1209, 970 N.Y.S.2d 653 (N.Y. 4th Dep't 2013) ("a party cannot generally avoid the effect of a document on the ground that he or she did not read it or know its contents."); Morby v. Di Siena Assoc. LPA, 291 A.D.2d 604, 605-06, 737 N.Y.S.2d 678, 680 (3d Dep't 2002) (A "party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms. . . . Having failed to read the release before signing it, plaintiff simply cannot establish the essential element of justifiable reliance. . . . Said differently, the allegedly fraudulent misrepresentation by [defendant] could have been readily discovered upon the reading of the document, and plaintiff cannot now avoid his obligations under a release he did not read merely by asserting that he 'thought' it was something else.").

Third, Plaintiffs asserted that the language contained in the Releases is ambiguous. However, this is not true based on the face of the document.

Fourth, Plaintiffs claimed that they should not be bound by the Releases because they did not negotiate the terms and were not represented by counsel. Again, they specifically negotiated the $3,000 payments. Moreover, the lack of representation is of no moment based on the precedent outlined above.

Fifth, Plaintiffs argued that the Releases cannot bar their FLSA claim because settlement of such claims requires approval of a Court or the USDOL. This is not necessarily the case with respect to pre-litigation releases as outlined above.

Sixth, Plaintiffs argued that they were not provided all promised consideration. This too is palpably false. The Releases clearly outlined that Plaintiffs were to be provided $3,000 in consideration. Plaintiffs conceded that they received $3,000 each, instead claiming that they did not receive the consideration promised because the $3,000 itself is less than what they claim is owed here. This red-herring could not be countenanced. Furthermore, as explained in significant detail in the factual background section, Plaintiffs were never offered reinstatement, despite

begging for same on numerous occasions. This was supported by text messages, the Release itself and the $3,000 checks which explicitly state "mutual agreement for termination of employment."

Lastly, Plaintiffs argued that they did not execute the Releases in the presence of a notary. Although Defendants dispute this assertion, the issue is immaterial because Plaintiffs <u>admit</u> that they signed the Releases and received the $3,000 consideration..

**<u>Plaintiffs' Position on the Merits Was Flawed</u>**

**I.     <u>Plaintiffs Did Not Work At All For Part of the Relevant Period</u>**

Plaintiffs' damage computations were predicated on the assumption that they worked every single week during the entire claims period. This is not the case. Specifically, the business was closed for every federal holiday, along with certain Jewish Holidays each year. In addition, the business was closed due to snow-storms approximately 1-2 days per year. Furthermore, the business was closed for approximately 2 months from March 23, 2020 to May 17, 2020 due to the Covid-19 Pandemic. Moreover, Machado did not return to work for Defendants until in or about June 2020 and was then out for nearly 2 months from August 2020 until the end of September 2020 due to eye surgery, along with another extended period in 2021. Rubio was also out from work due to Covid-19 infection in August 2020 and often missed days of work (or left early) due to child care issues. These issues were supported by Defendants' time and pay records.

**II.    <u>Plaintiffs Did Not Work The Hours Alleged</u>**

Plaintiffs allege that they worked an average of 78 hours per week (i.e. 13 hours per day, 6 days per week) and never took any breaks. However, such claims do not align with reality.

Prior to the Covid-19 Pandemic, Defendants' hours of operation were not even 13 hours per day (i.e. 7 a.m. to 6:30 p.m. Monday to Friday, 7 a.m. to 4:30 p.m. on Saturday and 9:30 a.m. to 3:30 p.m. on Sunday). During that time period, Plaintiffs' regular schedule was approximately 45 hours (7 a.m. to 3 p.m., Monday to Saturday less a 30-minute meal break per day). On occasion, Plaintiffs worked extra hours depending on business (but were compensated for same). Plaintiffs were required to record their hours worked during this period. Such records, which were produced, refute the claims that Plaintiffs worked the hours claimed (i.e. an average of less than 50% of the claimed overtime hours worked).

Upon reopening during the Covid-19 Pandemic, Defendants' hours of operation were reduced to 8 a.m. to 5:30 p.m., Monday to Saturday. Upon their return to work after the onset of the Covid-19 Pandemic, Plaintiffs worked a significantly reduced schedule.

Specifically, upon returning to work, Rubio was scheduled to work 8-hour shifts (less breaks), but generally worked 5 to 7 hours per day, often leaving early for various reasons. Although Rubio was scheduled to work Monday to Friday, on many occasions she missed complete days of work. Rubio's pay was not docked for missed hours or days. Overall, Rubio is not owed any wages for this period, as she worked a maximum of 40 hours per week.

Additionally, as of June 2020, Machado generally worked 8 hours per day (less breaks), 2 days per week. However, she did not work every week during that time period. Towards, the end of her employment, Machado sometimes worked 8 hours per day for 3 or 4 days per week.

### III. Plaintiffs Were Not Paid A Flat Rate of $10 Per Hour

Plaintiffs assert that they were paid $10 per hour for all hours worked throughout the relevant time period. This represents a fundamental misunderstanding in their pay structure. In total, Plaintiffs were paid $500 or $550 net wages plus tax withholdings on the payroll portion of their wages (during relevant periods). When Plaintiffs worked additional hours, they were paid at a regular rate computed utilizing their "net wages." When Plaintiffs worked on Sundays, if ever, they were paid an additional $100 for approximately 6 hours of work. This issue significantly decreased the alleged minimum wage violations asserted.

### IV. Machado's Claims Arising March 23, 2020 Are Barred By Judicial Estoppel

Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993). The purpose of the doctrine is "to protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749-50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (internal quotation marks and citations omitted); accord Adelphia Recovery Trust v. Goldman, Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014). "A party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, such as by rendering a favorable judgment." Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999) (internal citations omitted).[1]

Here, Machado applied for and received unemployment benefits (including federal benefits of $600 per week while applicable) from the start of the Covid-19 Pandemic through the end of her employment. In those applications, she certified under penalty of perjury that she was completely unemployed. As such, by filing weekly certifications with the New York Department of Labor indicating that she was unemployed and obtaining benefits, Machado could have been judicially estopped from claiming any damages for unpaid wages after that time.

### V. Defendants Are Entitled to a Set-Off

Defendants would have also been entitled to a set-off for monies loaned and/or paid to Plaintiffs in the total amount of $8,000. For instance, at the time of their separation, Rubio and Machado owed outstanding loans to Defendants respectively in the amounts of $1,100 and $900.

---

[1] Statements made to administrative agencies in applications for benefits can give rise to judicial estoppel. See, e.g., Mitchell v. Washingtonville Cent. Sch. Dist., supra, 190 F.3d at 6-8; see also Robinson v. Concentra Health Servs., 781 F.3d 42, 45-47 (2d Cir. 2015) (plaintiff's application for, and receipt of, disability benefits based on her statements to Social Security Administration that she was fully disabled judicially estopped her from making prima facie showing that she was qualified for her position as required to support race and color discrimination claims).

Furthermore, to the extent that the Releases are unenforceable, which is not the case, the $3,000 payments made to each Plaintiff will set-off any potential unpaid wage liability.

### VI.     The NYLL Claims Were Subject to Dismissal at the Pleading Stage

In several decisions issued this year, District Judge Chen held that FLSA plaintiffs lack standing to file NYLL § 195 claims in federal court. See Garrido v. House of Salads One LLC, 2022 U.S. Dist. LEXIS 58496 (Mar. 30, 2022, E.D.N.Y.)(ruling on a motion for default judgment); Wang v. XBB, Inc., 2022 U.S. Dist. LEXIS57481 (Mar. 29, 2022, E.D.N.Y.)(decision after trial); Francisco v. NY Tex. Care, Inc., 2022 U.S. Dist. LEXIS 55633 (Mar. 28, 2022, E.D.N.Y.)(denying class action certification on NYLL § 195 claims). Accordingly, Plaintiffs' NYLL § 195 claims were subject to dismissal, which would have required them to be re-filed in New York State Supreme Court. Had this litigation proceeded, Defendants would have moved the Court to decline exercising supplemental jurisdiction over the remaining NYLL claims (which predominated over the FLSA claims) so that all NYLL claims could have been litigated together in New York State Court.

### d.  The Settlement Amount is Fair and Reasonable

FLSA claims may only be settled and dismissed with prejudice under Rule 41 if they are approved by the Court. *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206-207 (2d Cir. 2015). "Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes." *Kochilas v. Nat'l Merch. Servs., Inc.*, 2015 WL 5821631, at *7 (E.D.N.Y. Oct. 2, 2015) (citation omitted). "Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of settlement." *Id*. (citation omitted). Furthermore, "[i]f the proposed settlement reflects a reasonable compromise over contested issues, the settlement should be approved." *Id*. (citations omitted). "Generally, there is a strong presumption in favor of finding a settlement fair, as the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Lliguichuzhca v. Cinema 60, LLC,* 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

The parties have agreed to settle all claims asserted in this matter for $115,000.00. The parties believe that this amount is reasonable considering the claims and defenses asserted and the fact that the terms of the Settlement Agreement was achieved only after a full-day mediation with all parties present before a qualified and experienced wage-and-hour neutral. The parties had genuine, bona fide disputes over the dates of Plaintiffs' employment, the number of hours worked by Plaintiffs and the amounts of pay received by Plaintiffs, but both sides made compromises on their positions in order to achieve a fair and reasonable settlement. As such, the settlement amount represents a fair compromise over the outstanding factual and legal disputes that would not have likely been resolved until the time of trial.

### II.     The Non-Monetary Terms of the Settlement Agreement are Fair and Reasonable

"In FLSA cases, courts in this District routinely reject release provisions that 'waive practically any possible claim against the defendants, including unknown claims and claims that

have no relationship whatsoever to wage-and-hour issues.'" *Gurung v. White Way Threading LLC*, 226 F. Supp. 3d 226, 228 (S.D.N.Y. 2016) (quoting *Lopez v. Nights of Cabiria, LLC*, 96 F. Supp. 3d 170, 181 (S.D.N.Y. 2015)). Moreover, "[i]n the context of an FLSA case in which the Court has an obligation to police unequal bargaining power between employees and employers, such broad releases are doubly problematic." *Martinez v. Gulluoglu LLC*, No. 15 Civ. 2727 (PAE), 2016 WL 206474, at *2 (S.D.N.Y. Jan. 15, 2016) (quoting *Camacho v. Ess-A-Bagel, Inc.*, No. 14-cv-2592 (LAK), 2014 WL 6985633, at *4 (S.D.N.Y. Dec. 11, 2014)).

Here, the release in Paragraph 2 of the Settlement Agreement ("Release") is appropriately limited to claims under the FLSA and NYLL and other related wage-and-hour claims that could have been asserted in this litigation. The Release does not raise any concerns regarding unequal bargaining power between Plaintiffs and Defendants and the Release is not overbroad such that there is a concern that Plaintiffs are releasing any and all possible claims against Defendants, including claims completely unrelated to the claims asserted in this action.

Furthermore, the Settlement Agreement does not contain any confidentiality provision that would otherwise preclude the parties from openly discussing their experiences litigating this matter as rejected by *Cheeks*.

As the Release is carefully drafted to comply with Second Circuit case law in FLSA matters and there is no confidentiality clause contained in the Settlement Agreement, the parties' position is that the non-monetary terms of the Settlement Agreement are also fair and reasonable and comport with the standards articulated in *Cheeks*.

### III. Distribution to the Plaintiffs and Requested Attorneys' Fees and Expenses

#### a. Distribution to the Plaintiffs

The parties agreed to a global settlement of $115,000.00 to resolve all claims asserted in this action. If the Agreement is approved by the Court, Plaintiffs will recover an aggregate amount of $75,949.00, after requested attorneys' fees and reimbursement of expenses. Each Plaintiff will receive an equal share of the settlement proceeds in the amount of $37,974.50, as Plaintiffs had nearly identical claims as to the alleged dates of their employment, their alleged hours worked and their alleged rates of pay received during their employment.

#### b. Plaintiff's Counsel's Requested Attorneys' Fees and Expenses

Plaintiff's counsel respectfully requests $1,077.00 for identifiable expenses, which include:

- the Eastern District of New York filing fee in this matter: $402.00
- the cost of the EDNY Court-annexed mediation: $675.00

Plaintiffs' counsel respectfully requests one-third of the settlement amount less the above expenses ($113,923.00), or $37,974.00 in attorneys' fees, as agreed upon in Plaintiffs' retainer agreements with this firm. Therefore, if this request is approved, the total amount to be paid to the attorneys for their fees and expenses in this matter is $39,051.00.

As such, the settlement funds as broken down into component parts is as follows:

**Settlement Amount:** $115,000.00
**Attorneys' Expenses:** $1,077.00
**Net Settlement Amount:** $113,923.00 ($115,000.00 - $1,077.00)
**Requested Attorneys' Fees:** $37,974.00 ($113,923.00 / 3)
**Total payable to Attorneys:** $39,051.00 ($37,974.00 + $1,077.00)
**Total payable to Plaintiffs:** $75,949.00 ($115,000.00 - $39,051.00)

Our office and the Plaintiffs have retainer agreements that are reduced to writing and are signed by the Plaintiffs. Attorneys' fees of 33% on FLSA and NYLL claims are routinely approved by courts in the Second Circuit. *See, e.g., Calle v. Elite Specialty Coatings Plus, Inc.,* 2014 U.S. Dist. LEXIS 164069 (E.D.N.Y. Nov. 19, 2014) (approving settlement of FLSA and NYLL claims stating that a "one-third contingency fee is a commonly accepted fee in this Circuit"); *Rangel v. 639 Grand St. Meat & Produce Corp.,* 2013 U.S. Dist. LEXIS 134207 (E.D.N.Y. Sept. 19, 2013). Courts in this District typically approve a fee of one-third or less of the settlement amount. *See Santos v. Yellowstone Props, Inc*., 2016 WL 2757427 at *4 (S.D.N.Y. May 10, 2016).

This request for attorneys' fees is supported by the work performed by Plaintiffs' counsel and the recovery secured through their efforts. Furthermore, the fee requested is reasonable in relation to the recovery received by Plaintiffs.

### IV.   Closing

In closing, the parties believe that the settlement amount and the terms of the Agreement are fair and reasonable. The settlement was the product of good faith negotiations between experienced and competent counsel and the terms of the Settlement Agreement comport with Second Circuit case law. As such, we respectfully request that the Court approve the Settlement Agreement in its entirety and dismiss this action against Defendants. We thank the Court for its consideration and remain available to provide any additional information.

Respectfully submitted,

*James O'Donnell*
James O'Donnell, Esq.